### VEATCH et al. v. WHITE et al.

Circuit Court of Appeals. Ninth Circuit.
November 28, 1927.

No. 5205.

1. **States** ⊝12(2)—Creation of slough channel in Columbia river by avulsion did not affect boundary of states designated as middle channel of river (Act Feb. 14, 1859, § 1 [11 Stat. 383]; Const. Wash. art. 24, § 1).

Creation of slough channel in Columbia river by avulsion, and not by erosion, *held* not to affect boundary of states fixed by Act Feb. 14, 1859, § 1 (11 Stat. 383), and Const. Wash. art. 24, § 1, as middle channel of river, where it was divided by islands, and at the middle of the widest channel thereof, and demarking line remained center of channel before avulsion.

2. **States** ⊝12(2)—Shoaling and elevation of river bottom held not to affect question of state boundary, designated as river channel.

Shoaling and elevation of bottom of river *held* not to affect question of state boundary, designated as middle channel of river affected thereby, since center line of channel does not mean deepest channel, nor the boundaries defined by widest navigable channel.

Appeal from the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Suit by George McD. White and another against John C. Veatch and others. Decree for plaintiffs, and defendants appeal. Affirmed.

I. H. Van Winkle, Atty. Gen., of Oregon, and Willis S. Moore, Asst. Atty. Gen., of Oregon, for appellants.

J. M. Scudder and John K. Kollock, both of Portland, Or., for appellees.

E. W. Anderson, Asst. Atty. Gen., of Washington, amicus curiæ.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

HUNT, Circuit Judge. Appellees, plaintiffs below, under licenses issued by the state of Washington, operate fish traps in the Columbia river, and contend that the locations of the traps are within the territorial jurisdiction of that state. Defendants appellants deny that the traps are located within the jurisdiction of Washington, and allege that they are within the state of Oregon. The District Court held that the traps were located within the jurisdiction of Washington, and issued injunction against interference. Defendants, who are fish commissioners of the state of Oregon, appealed.

Reduced to a short statement, appellants' position is that about the points of location of the traps the middle of the channel of the Columbia has shifted northward until it is now between Puget Island and the fish traps; that such change has resulted from erosion of the shore of Puget Island, and the formation of shoals or sand bars on the Oregon side; and that the boundary between Washington and Oregon has correspondingly changed.

In the act of Congress admitting Oregon into the Union (Act Feb. 14, 1859, 11 Stat. 383), the boundary was fixed as follows: "Beginning one marine league at sea due west from the point where the forty-second parallel of north latitude intersects the the same; thence northerly, at the same distance from the line of the coast, lying west and opposite the state, including all islands within the jurisdiction of the United States, to a point due west and opposite the middle of the north ship channel of the Columbia river; thence easterly, to and up the middle channel of said river, and, where it is divided by islands, up the middle of the widest channel thereof, to a point near Fort Walla Walla." Section 1.

The boundary of the state of Washington was fixed by article 24, § 1, Constitution of Washington (2 Hill's Ann. St. & Codes,

p. 851), as follows: "Beginning at a point in the Pacific Ocean one marine league due west of and opposite the middle of the mouth of the north ship channel of the Columbia river; thence running easterly to and up the middle channel of said river and where it is divided by islands up the middle of the widest channel thereof to where the forty-sixth parallel of north latitude crosses said river near the mouth of the Walla Walla river."

We gather from the evidence that the traps are located in a part of the Columbia river where it is divided into two channels by Puget Island which belongs to the State of Washington, the channel south of the island being the wider of the two. The locations are at points which were formerly in the exposed area of Puget Island on the Washington side. After 1887 the southern shore of Puget Island slowly eroded and the shore line moved northward approximately 1,000 feet or more, with the result that the river was widened and the center of the channel moved north to some extent. For a long time prior to 1894 the middle of the channel of the Columbia was at a considerable distance south of the point where the fish traps are located, and certainly until about 1894 the only navigable channel in the immediate vicinity of the traps was south of the points where the traps are located.

Years ago, between 1859 and 1874, in the southern shore of Puget Island there was a slough running in a north westerly direction from the Columbia river. The slough, although only used by fishing boats, had a channel that was shallow and more or less filled with snags. So much of the area of Puget Island as was separated from the mainland by this slough was called Coffee Island, which gradually became submerged. Some time before 1894 the water of the river began to bore out and enlarged the slough, and when freshet waters of 1894 came the slough was so enlarged that a channel formed, which after 1894 was used for navigation. After this new channel was created, shoals formed to some extent on the south, or Oregon, side of Coffee Island, and navigation on that side became unsafe for deep draft ships, but there is no evidence of any erosion of the Oregon shore. In 1893 government engineers endeavored to deepen the channel between Coffee Island and Puget Island, but in 1925 they abandoned their efforts and dredged a new channel close to the Oregon shore.

[1] Our opinion is that the creation of the slough channel was not by erosion, but was avulsion, and therefore did not affect the boundary of the states. This view is strengthened by the opinion of the court in Nebraska v. Iowa, 143 U. S. 359, 12 S. Ct. 396, 36 L. Ed. 186, where it was said to be well settled that, "where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary, and that the boundary remains as it was, as in the center of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed, in the law, avulsion. In Gould on Waters, § 159, it is said: 'But if the change is violent and visible, and arises from a known cause, such as a freshet, or a cut through which a new channel is formed, the original thread of the stream continues to mark the limits of the two estates.'" In re Buffalo, 206 N. Y. 319, 99 N. E. 851.

[2] Nor does the fact of the shoaling and elevation of the bottom of the river affect the question, for it is laid down in Washington v. Oregon, 211 U. S. 127, 29 S. Ct. 47, 53 L. Ed. 118, that the center line does not mean the deepest channel; nor that the boundary is defined by the widest navigable channel. In that case the court said:

"Concede that to-day, owing to the gradual changes through accretion, the north channel has become much less important, and seldom, if ever, used by vessels of the largest size, yet when did the condition of the two channels change so far as to justify transferring the boundary to the south channel, on the ground that it had become the main channel? When and upon what conditions could it be said that grants of land or of fishery rights made by the one state ceased to be valid, because they had passed within the jurisdiction of the other? Has the United States lost title to Sand Island by reason of the change in the main channel? And, if by accretion the north should again become the main channel, would the boundary revert to the center of that channel? In other words, does the boundary move from one channel to the other, according to which is, for the time being, the most important, the one most generally used? These considerations lead to the conclusion that when, in a great river like the Columbia, there are two substantial channels, and the proper authorities have named the center of one channel as the boundary between the states bordering on that river, the boundary, as thus prescribed, remains the boundary, subject to the changes in it which come by accretion, and is not moved to the other channel, although the latter in the course of years

becomes the most important and properly [is] called the main channel of the river."

Again, in an opinion denying a rehearing (214 U. S. 205, 29 S. Ct. 631, 53 L. Ed. 969), the court expressed its agreement with the contention that the term "widest channel" does not mean the broadest expanse of water, and said: "There must be in the first instance a channel—that is, a flow of water—deep enough to be used and in fact used by vessels 'in passing up and down the river; but it does not mean the deepest channel, but simply the widest expanse of water which can reasonably be called a channel."

The applicability of these decisions is direct. They lead to the conclusion that, though by erosion of Puget Island the river has widened and the center of the old channel has been changed somewhat, and has become more shallow than it was at the time of the fixing of the boundary of the state of Oregon, such changes are not to be confused with changes made by the creation of the slough channel, which was caused by sudden and known causes, not by accretion. The demarking line must therefore remain the center of the channel between Puget Island and Oregon before the avulsion.

The decree of the District Court is affirmed.