OMAHA INDIAN TRIBE, TREATY OF 1854 WITH the UNITED STATES (10 Stat. 1043), Organized pursuant to the Act of 6/18/34 (48 Stat. 984; 25 U.S.C. § 476) as amended, Appellant,

v.

Roy Tibbals WILSON, Charles G. Lakin, Florence Lakin, R. G. P. Incorporated, an Iowa corporation, Harold Jackson, Otis Peterson, Travelers Insurance Company, The State of Iowa, Darrell L., Harold, Harold M. and Luea Sorenson, State Conservation Commission of the State of Iowa, Appellees.

UNITED STATES of America, Appellant,

v.

Roy Tibbals WILSON, Charles G. Lakin, Florence Lakin, R. G. P. Incorporated, an Iowa corporation, Harold Jackson, Otis Peterson, Travelers Insurance Company and the State of Iowa, Appellees.

Nos. 77–1384, 77–1387.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1977.

Decided Jan. 15, 1980.

Rehearing and Rehearing En Banc Denied Feb. 8, 1980.

---

William H. Veeder, Washington, D. C., for Omaha Indian Tribe.

Thomas R. Burke and Lyman L. Larsen, Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., for appellee, Harold Jackson.

Edson Smith and Robert H. Berkshire, Swarr, May, Smith & Andersen, Omaha, Neb., for appellee, Roy Tibbals Wilson, et al.

Peter J. Peters, Council Bluffs, Iowa, for appellees, RGP, et al.

Lowell Kindig, Kindig, Beebe, Rawlings, Nieland & Killinger, Sioux City, Iowa, for appellee, Travelers Insurance Co.

Maurice B. Nieland, Kindig, Beebe, Rawlings, Nieland & Killinger, Sioux City, Iowa, for appellee, Harold M. Sorenson, et al.

Thomas J. Miller, Atty. Gen., Des Moines, Iowa and Bennett Cullison, Jr., Harlan, Iowa, for appellees, State of Iowa, et al.

Before LAY, Chief Judge,* and STE-PHENSON and HENLEY, Circuit Judges.

LAY, Chief Judge.

These cases have been remanded to us by the United States Supreme Court for reconsideration in light of the principles set forth in its June 20, 1979 opinion. *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979).

## I. *Factual Background.*

At issue is ownership of approximately 2,900 acres of land lying adjacent to the Missouri River in an area called Blackbird Bend located in what was then the Territory of Nebraska, and which is conceded to have been set aside in 1854 by treaty as a reservation for the Omaha Indian Tribe. The tortured history of the land dispute and attendant controversy over the nature of the early movements of the Missouri River is fully set forth in the district court's opinion, 433 F.Supp. 67 (N.D.Iowa 1977), as well as in this court's previous decision, 575 F.2d 620 (8th Cir. 1978). This court reversed the district court's judgment in favor of the defendants and against the Tribe. We did so for two reasons: (1) We held the district court failed to apply federal law rather than state law in regard to burden of proof, 25 U.S.C. § 194, and substantive law concerning accretion and avulsion; and (2) we found the proof of accretion adduced by defendants was conjectural and speculative and defendants failed to meet the requisite burden.

The Supreme Court granted certiorari, confining its review to the applicability of 25 U.S.C. § 194, and whether federal or state law should have been employed to

determine the substantive issue of river movement.

Generally, the Court sustained our holding that 25 U.S.C. § 194 was applicable and placed both the burden of going forward with the evidence and of persuasion upon the defendants.[1] The statute reads:

> In all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership.

The Court also agreed that the Tribe's right to the property depended upon federal law, " 'wholly apart from the application of state law principles which normally and separately protect a valid right of possession,' " —— U.S. at ——, 99 S.Ct. at 2539 (quoting *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 677, 94 S.Ct. 772, 782, 39 L.Ed.2d 73 (1974)). Nonetheless, the Court held the legal standard to be employed in determining whether accretion or avulsion occurred, absent any boundary dispute or other need for a uniform federal rule, should be borrowed from applicable state property law, in this case the law of the State of Nebraska. 99 S.Ct. at 2543.

## II. *Nebraska Law.*

On review of the governing principles of state law, we hold the district court's interpretation of Nebraska law was incorrect, and adhere to our prior opinion that all parties making claim against the Tribe, with the exception of the State of Iowa, demonstrated only speculative and conjectural evidence of their right to have title to the reservation land, which was granted to the Tribe by the Treaty of 1854, quieted in them. We hold that those parties failed to sustain the burden of proof placed upon them by 25 U.S.C. § 194 and title to the

* Judge Lay became Chief Judge of the Eighth Circuit on January 1, 1980.

1. The Court held 25 U.S.C. § 194 did not apply to land claimed by the State of Iowa, because a

sovereign could not be construed to be a "white person" within the meaning of the statute. *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 667, 99 S.Ct. 2529, 2537–38, 61 L.Ed.2d 153 (1979).

land in question should be quieted in the Tribe.[2]

Our disagreement with the district court was with its broad definition of accretion and correspondingly narrow definition of avulsion. We stated:

> The trial court . . . held that a sudden and unusual (erratic) jump or movement of the thalweg without evidence of identifiable land in place falls within the historical rule of accretion. We find this ruling inconsistent with settled principles governing the rule of accretion and the broader parameters involving the doctrine of avulsion.

575 F.2d at 639.

We also held the district court erroneously placed the burden of proof on the Tribe, although it did not give defendants the benefit of a presumption of accretion. *Id.* at 633. The result was that defendants received the benefit of any favorable inferences from sketchy proof of avulsion: what was not clearly proved avulsive must, in the district court's view, be the result of accretion.

The Supreme Court's decision makes it clear that defendants shoulder the burden of persuasion on the question of whether the Tribe is no longer entitled to possession of the area which was in the past part of its reservation. To quiet title in themselves, defendants must show the strength of their title; they must prove by a preponderance of the evidence that the River changed by the process called accretion. Thus they do not have the advantage, as they did under

the trial court's reasoning, of inferences drawn from any weaknesses in evidence tending to show avulsion. *See Mitchell v. Beermann*, 175 Neb. 616, 620, 122 N.W.2d 525, 527 (1963); *Jones v. Schmidt*, 170 Neb. 351, 355, 102 N.W.2d 640, 644 (1960); *De Long v. Olsen*, 63 Neb. 327, 329, 88 N.W. 512, 513 (1901).

Upon examination of Nebraska case law, we conclude Nebraska adheres to the common law principles governing avulsion and accretion set forth in our earlier opinion.[3] Federal and Nebraska law do not differ substantially in the basic definition of the terms, perhaps because of the shared origin of the common law principles in Roman and early English law. Our prior analysis, commencing with early definitions from the Institutes of Justinian through the early United States Supreme Court cases including *Missouri v. Kentucky*, 78 U.S. (11 Wall.) 395, 20 L.Ed. 116 (1870); *Jefferis v. East Omaha Land Co.*, 134 U.S. 178, 10 S.Ct. 518, 33 L.Ed. 872 (1890); *Nebraska v. Iowa*, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1892), and this court's decisions in *Davis v. Anderson-Tully Co.*, 252 F. 681 (8th Cir. 1918); *Commissioners of Land Office v. United States*, 270 F. 110 (8th Cir. 1920), *appeal dismissed*, 260 U.S. 753, 43 S.Ct. 14, 67 L.Ed. 497 (1922), finds full accord in Nebraska case law. Nearly all the earlier Nebraska cases we have examined rely upon these and other early federal cases for definitions of accretion and avulsion.

The early United States Supreme Court cases of *Mayor, Aldermen & Inhabitants of*

---

**2.** The Supreme Court stated we found the evidence was in "equipoise." 442 U.S. at 663, 99 S.Ct. at 2535. We recognize the Court could have reasonably concluded we found the evidence evenly balanced from our statement that "defendants have failed in sustaining their burden of proof under § 194." Nevertheless, we did not intend to convey that assessment of the weight of the evidence. Nor do we here; rather, we adhere to our prior holding that defendants failed to meet their burden because their "case establishes only speculative inferences as to whether the thalweg moved by accretion or avulsion in the critical time periods involved." *Omaha Indian Tribe v. Wilson*, 575 F.2d 620, 650 (8th Cir. 1978).

**3.** We note the district court, as well as the original briefs of each of the defendants, the Government and the Tribe expressed the opinion that Nebraska law governing accretion and avulsion was not substantially different from federal law. While we still disagree with the district court's failure to use federal law in allocating the burden of proof, it is now decided that governing substantive rules are not drawn from the federal common law. With the case in this changed posture, we agree with the district court's statement that, as to definitions of accretive and avulsive movement of the Missouri River, there is no significant difference between federal and Nebraska law relevant to this case. *United States v. Wilson*, 433 F.Supp. 57, 65 (N.D.Iowa 1977).

*New Orleans v. United States*, 35 U.S. (10 Pet.) 662, 9 L.Ed. 573 (1836) and *County of St. Clair v. Lovingston*, 90 U.S. (23 Wall.) 46, 23 L.Ed. 59 (1874), were cited as rules of decision and quoted in the early Nebraska case of *Gill v. Lydick*, 40 Neb. 508, 59 N.W. 104 (1894), and also in *Frank v. Smith*, 138 Neb. 382, 293 N.W. 329 (1940). As the Nebraska Supreme Court stated in *Lienmann v. Sarpy County*, 145 Neb. 382, 392, 16 N.W.2d 725, 729 (1944), citing several representative cases, it "has repeatedly followed the rules of law as stated in *State of Nebraska v. Iowa*, supra." *See also, Mercurio v. Duncan*, 131 Neb. 767, 769, 269 N.W. 901, 902 (1936); *Independent Stock Farm v. Stevens*, 128 Neb. 619, 621, 259 N.W. 647, 648 (1935); *Iowa Railroad Land Co. v. Coulthard*, 96 Neb. 607, 610, 148 N.W. 328, 329 (1914); *De Long v. Olsen*, 63 Neb. at 331, 88 N.W. at 514. Principles articulated by this court in *Commissioners of Land Office v. United States*, 270 F. 110 (8th Cir. 1920), *appeal dismissed*, 260 U.S. 753, 43 S.Ct. 14, 67 L.Ed. 497 (1922), were quoted with approval in *State v. Ecklund*, 147 Neb. 508, 521–22, 23 N.W.2d 782, 789–90 (1946) and were applied in *Durfee v. Keiffer*, 168 Neb. 272, 280, 95 N.W.2d 618, 624 (1959), and *Frank v. Smith*, 138 Neb. at 392, 293 N.W. at 334–35. An even earlier eighth circuit case, *Whiteside v. Norton*, 205 F. 5 (8th Cir. 1913), *appeal dismissed*, 239 U.S. 144, 36 S.Ct. 97, 60 L.Ed. 186 (1915), was also followed in *Durfee v. Keiffer*. As the district court stated: "Nebraska law has relied heavily on federal law in formulating its definitions of accretion and avulsion." *United States v. Wilson*, 433 F.Supp. at 65.

The case of *Nebraska v. Iowa*, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1892), which has had a seminal influence on the development of the legal definitions of accretion and avulsion in Nebraska case law, established that while the nature of the Missouri River might lead one to assume otherwise, the law of boundary changes due to diminution and accretion could apply to the River, at least "in the mere washing of the waters

of the stream." *Id.* at 370, 12 S.Ct. at 400. While erosion might take place rapidly on the banks of the Missouri, the boundary change rule would still apply as long as the land eroded so as to be completely disintegrated, *and* the accretion, despite the unusual rapidity of the erosion, was "a mere gradual and imperceptible process." *Id.* at 369, 12 S.Ct. at 399; *see also, De Long v. Olsen*, 63 Neb. at 331, 88 N.W. at 514.

■ As Nebraska case law makes clear, this basic statement of accretive change in the Missouri River has two elements. First, a boundary changes only where the River's change of channel is caused by a process of erosion or excavation of earth from one bank and deposition of unidentifiable silt and sediment on the other—the land between the old and new channels must be completely disintegrated. This point is made most dramatically in *State v. Ecklund*, a case in which title to old river bed land, bared by a river's gradual change in channel, was retained in accordance with the original boundary line, as is the case in avulsion. The river movement was not accretive, as the term is legally defined, because the river did not shift its channel by excavating or eroding intervening land, but by flowing around it. 147 Neb. at 523, 23 N.W.2d at 789. Other cases, involving title to islands rather than old river bed land, also illustrate the principle. *E. g., Valder v. Wallis*, 196 Neb. 222, 242 N.W.2d 112 (1976); *Durfee v. Keiffer*.

■ The second element, stressed by the court in *Nebraska v. Iowa*, is that no matter how "rapid and great" is "the abrasion and washing away," or "the diminution," of soil, the accretion (or reliction) of soil "is always gradual and by the imperceptible deposit of floating particles of earth." 143 U.S. at 368–69, 12 S.Ct. at 399.[4] This point, the gradual and imperceptible nature of accretive change as stressed in *Nebraska v. Iowa*,

---

4. Gradual and imperceptible does not mean change cannot be perceived, but only that the entire process, that is the accretion as well as

the often rapid erosion, is not clearly perceptible as it is going on. *Gill v. Lydick*, 40 Neb. 508, 510–11, 59 N.W. 104, 105 (1894).

is evident in Nebraska cases.[5] *See, e. g., Bouvier v. Stricklett*, 40 Neb. 792, 798–99, 59 N.W. 550, 553 (1894); *Gill v. Lydick*, 40 Neb. at 512, 59 N.W. at 105; *Mercurio v. Duncan*, 131 Neb. at 768–69, 269 N.W. at 903; *Jones v. Schmidt*, 170 Neb. at 356, 102 N.W.2d at 644.

■ Clear distinctions become obscured when applied to the actual movement of uncontrolled rivers, as we noted in our prior opinion. Nevertheless, the elements of river channel change through the process of excavation or erosion and deposition or accretion must have been established for defendants to have met their burden of proof under Nebraska law. Not only is accretive change defined more precisely in Nebraska law than in the district court's opinion, but correspondingly, the Nebraska Supreme Court's definition of avulsion is similar to that set forth in our prior opinion as the federal standard, in that it is not as narrow as the district court's reasoning would indicate.[6] In contrast to the process of erosion and gradual deposition, avulsive movements of a river channel are characterized primarily by their suddenness and perceptibility.

■ The Nebraska cases indicate Nebraska follows the basic common law principle: avulsion occurs when there is a sudden and rapid change of the channel, within or without the bed of a stream, whether or not intervening land is submerged during a sudden flood. A recent definition given by the Nebraska Supreme Court indicates the broad parameters of avulsive movement include movement within the river bed, and also illustrates the primary emphasis on sudden change:

> " 'Avulsion' is a sudden and perceptible loss or addition to land by the action of water, *or* a sudden change in the bed or course of a stream." 78 Am.Jur.2d, Waters, s. 406, p. 852. See, also, *Ziemba v. Zeller*, 165 Neb. 419, 86 N.W.2d 190; *Mercurio v. Duncan*, 131 Neb. 767, 269 N.W. 901.

*Valder v. Wallis*, 196 Neb. 222, 224, 242 N.W.2d 112, 114 (1976) (emphasis added).

Other cases stress the sudden character of avulsive change as its primary distinction from the process of erosion and gradual deposition. *See, e. g., Gill v. Lydick*, 40 Neb. at 512, 59 N.W. at 105 ("[B]ut, if the alteration takes place suddenly, the land thus formed does not belong to the proprietor of the adjoining soil."); *Wiggenhorn v. Kountz*, 23 Neb. at 694, 37 N.W. at 605 (quoting 3 Washburn R.P. 60 (4th ed.)) (" 'The difference between avulsion, . . . and alluvion, consists in the one being done by imperceptible loss from the land of one, and increment to that of the other; and in the other, its being done suddenly, to an extent which can be ascertained and measured.' "); *Ingraham v. Hunt*, 159 Neb. 725, 732, 68 N.W.2d 344, 348–49 (1955) ("a flood suddenly, violently, and visibly, by avulsion, changed its channel . . . during the next few years, there were several flash

---

**5.** Both elements are necessary. Gradual change without erosion of intervening land is not within the rule of accretive change, *see State v. Ecklund*, 147 Neb. 508, 23 N.W.2d 782 (1946); nor is the washing away of soil sufficient, if the land is not gradually added, but suddenly formed. *See Wiggenhorn v. Kountz*, 23 Neb. 690, 37 N.W. 603 (1888). Statements echoing those of the Court in *Nebraska v. Iowa*, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1892) concerning the rapidity of change in the Missouri, *see, e. g., De Long v. Olsen*, 63 Neb. 327, 331, 88 N.W. 512, 514 (1901); *Kinkead v. Turgeon*, 74 Neb. 580, 586–89, 109 N.W. 744, 746–47 (1906), (vacating 74 Neb. 573, 104 N.W. 1061 (1905)); *see also* discussion in *United States v. Wilson*, 433 F.Supp. 57, 62–64 (N.D. Iowa 1977), refer to the rapid and sudden erosion and do not lessen the importance of the gradual and imperceptible requirement as it pertains to the second element of the movement process, accretion (or reliction) of soil. *See Nebraska v. Iowa*, 143 U.S. at 369, 12 S.Ct. 396.

**6.** It should be noted that there is no presumption in Nebraska law that change in a river channel in general or in the Missouri is due to accretion. *See Jones v. Schmidt*, 170 Neb. 351, 102 N.W.2d 640 (1960). In fact, even though the Supreme Court decided in *Nebraska v. Iowa*, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186 (1892), that accretion could occur on the Missouri, the Nebraska Supreme Court noted that "[t]he Missouri river often changes its course by avulsion, . . . ." *Independent Stock Farm v. Stevens*, 128 Neb. 619, 621, 259 N.W. 647, 648 (1935).

floods which again suddenly, violently, and visibly by avulsion moved the channel . . . ."); *Jones v. Schmidt*, 170 Neb. at 356, 102 N.W.2d at 644 (Some of the new structures [of land] came into being with suddenness, and others imperceptibly by addition over long periods of time to other structures . . . the latter . . . is termed accretion.")[7]

Thus, in a channel shift the primary distinction in Nebraska law is between sudden and perceptible change and the process of erosion and gradual, imperceptible deposition. We adhere, therefore, to our earlier holding that the district court erred in including within the definition of accretive change a sudden movement without evidence of identifiable land in place.[8] Defendants' burden is not met by the absence of proof of identifiable land in place; of greater importance is the sufficiency of proof of erosion and gradual accretion. Because the unusually sudden and rapid erosion on the Missouri blurs the theoretical distinction between avulsion and accretion, the presence of identifiable land in place may have significant probative value in that it disproves one element of accretive change: erosion. *Omaha Indian Tribe v. Wilson*, 575 F.2d at 637. The absence of identifiable land above high water cannot make defendants' case, however. Erosion must be shown; the mere fact that intervening land was once submerged does not yield the inference of river movement by accretion. For instance, in *State v. Ecklund*, the intervening land in a channel change was old river bed land. This fact alone did not justify application of the rule of accretion, however. The boundary remained the same, because the cause of the channel change was not gradual movement across the land by excavation and accretion, but diversion of the river's flow around a body of land. *Ecklund* relied upon an early opinion of this court concerning the situation where change, albeit gradual, is not due to erosion and subsequent accretion:

> To this rule, however, there is a well-established and rational exception. It is that, where a river changes its main channel, not by excavating, passing over, and then filling the intervening place between its old and its new main channel, but by flowing around this intervening

---

7. While the district court correctly noted the Nebraska Supreme Court reversed an earlier finding of avulsion and held movement which occurred during a single high water period caused by an ice jam was accretive in *Conkey v. Knudsen*, 143 Neb. 5, 8 N.W.2d 538 (1943) (vacating 141 Neb. 517, 4 N.W.2d 290 (1942)), the decision does not, we feel, represent a departure from the basic common law definitions. It may be better explained by the fact that no party pleaded avulsion, as none had title to the land in question if the old channel remained as the boundary. They sought title through adverse possession of accretive land. *Id.* at 8, 9, 8 N.W.2d at 541. *Conkey II* does mention absence of identifiable land, but nevertheless gives the basic common law definition of avulsion: "Avulsion is the sudden and rapid change in the course and channel of a boundary river." *Id.* at 10, 8 N.W.2d at 541.

8. Although we illustrated with specific federal cases, *Veatch v. White*, 23 F.2d 69 (9th Cir. 1927); *Uhlhorn v. United States Gypsum Co.*, 366 F.2d 211 (8th Cir. 1966), *cert. denied*, 385 U.S. 1026, 87 S.Ct. 753, 17 L.Ed.2d 674 (1967), we noted in other jurisdictions adopting common law principles, identifiable land in place is a "significant" factor, but not the *sine qua non* to finding an avulsive shift of channel. We specifically cited Nebraska cases that referred to identifiable land in place when using Vattel's reference to avulsion in illustrating the "insensible" character of accretion, quoted in *Nebraska v. Iowa*, 143 U.S. 359, 366, 12 S.Ct. 396, 398, 36 L.Ed. 186 (1892): "[W]hen the violence of the stream separates a considerable part from one piece of land and joins it to another, but in such manner that it can still be identified, the property of the soil so removed naturally continues vested in its former owner." We then noted the context was not a narrow definition of avulsion, but rather the Supreme Court's attempt to show accretion, as well as avulsion, could take place on the Missouri. *Omaha Indian Tribe v. Wilson*, 575 F.2d 620, 635 n.30 (8th Cir. 1978). Our analysis of federal case law and that of other jurisdictions, set forth in section V, concludes that other jurisdictions concur in the general definition of avulsion as sudden movement and the possibility of its occurrence within *as well as without the bed of* a stream. *Id.* at 637 n.32, 33. We concluded: "Several state cases have similarly recognized that the sudden, perceptible change of the channel, whether within or without the river's original bed, is a critical factor in defining an avulsion. *Id.* at 637 (footnote omitted).

land, which never becomes in the meantime its main channel, and the change from the old to the new main channel is wrought during many years by the gradual or occasional increase from year to year of the proportion of the waters of the river passing over the course which eventually becomes the new main channel, and the decrease from year to year of the proportion of its waters passing through the old main channel until the greater part of its waters flow through the new main channel, the boundary line between the estates remains in the old channel subject to such changes in that channel as are wrought by erosion or accretion while the water in it remains a running stream.

147 Neb. at 522, 23 N.W.2d at 789–90 (quoting *Commissioners of Land Office v. United States*, 270 F. at 113).[9]

■ Because both inundation and baring of land are part of the swift change process referred to as avulsion, *see* Beck, *The Wandering Missouri River: A Study in Accretion Law*, 43 N.D.L.Rev. 429, 431 (1967), intact land may well be temporarily under high water. As was noted by the district court, 433 F.Supp. at 65, when a bank is composed of point bar deposits, or sand and sediment, it may be difficult to detect land present prior to the swift inundation and baring of avulsive movement. Similarly, deposits of alluvion which increase a bank by accretion may follow avulsive changes. *See, e. g., Independent Stock Farm v. Stevens*, 128 Neb. at 622, 259 N.W. at 649. Therefore, evidence of relative variations in water elevation at different times and some changes in topographical conditions alone is not sufficient to prove accretion. *See e. g., Jones v. Schmidt*, 170 Neb. 351, 358, 102 N.W.2d 640, 645 (1960).

■ We conclude both Nebraska and federal common law apply the same basic definitions of avulsion and accretion to boundary disputes caused by a river channel

change. We hold the district court incorrectly interpreted the Nebraska cases to hold that all river movements, other than those in which intervening land above the high water mark is identifiably in place, are included within the term accretion. Thus, our review of the evidence in sections VI—VIII of our prior opinion compels the same holding: defendants' evidence supports only speculative inferences as to whether the thalweg moved by accretion or avulsion in the critical time periods. Inferences drawn from the 1879 map, admittedly prepared at high water, are inconclusive; prior alluvion in that area means identifying features would be few; erosion on the surface of the point of land could have occurred as it was bared following swift inundation in the avulsive process. As we observed in our earlier opinion, the evidence strongly suggests avulsive change in 1879 through a series of chute channels or a cut-off across the neck of the Blackbird Bend. As to the later time periods, the little scientific evidence there is in the record contradicts the defendants' theory.

### III.  *Application of Law to Facts.*

■ Even assuming the district court properly interpreted Nebraska law, nonetheless our review of the record demonstrates the district court findings are clearly erroneous. Even if it be assumed that identifiable land in place is the *sine qua non* of avulsive movement, the evidence of identifiable land in place or the lack thereof is simply too inconclusive, too dependent on speculation and conjecture, to support the inference of accretive change. Not only is defendants' evidence of a lack of identifiable land in place inconclusive, *Omaha Indian Tribe v. Wilson*, 575 F.2d at 640–41, but there is evidence the land could be the same surface area described by Barrett. *Id.* at 641. Evidence supporting the possibility of avulsive chute channels or a neck cut-off does not equally balance defendants' proof, but rather points to the speculative and

9.  *Commissioners of Land Office v. United States*, 270 F. 110 (8th Cir. 1920), *appeal dismissed*, 260 U.S. 753, 43 S.Ct. 14, 67 L.Ed. 497 (1922), relied upon *Davis v. Anderson-Tully Co.*, 252 F. 681 (8th Cir. 1918), which was quoted in our prior opinion. *Omaha Indian Tribe v. Wilson*, 575 F.2d 620, 637 n.34 (8th Cir. 1978).

conjectural nature of *any* conclusions drawn from the evidence. Evidence of river movement in the critical periods too often gives no more than a basis for an "educated guess," in the words of defendants' expert witness, Dr. George R. Hallberg. Particularly in light of the requirement that defendants, because of the presumption applicable under 25 U.S.C. § 194, succeed on the strength of their own case and not any weakness in their opponents' claim to title, we conclude they failed to meet their burden of proof. As we stated previously, "the ultimate conclusion may not rest on mere guesswork." *Omaha Indian Tribe v. Wilson*, 575 F.2d at 650.

IV. *State of Iowa.*

We turn now to the reversal of this court's judgment that the State of Iowa was similarly bound by 25 U.S.C. § 194's allocation of the burden of proof. The record is not clear as to the time period and as to the specific land involved, in the Tribe's claim that land allegedly owned by the State was cut away from the reservation by avulsion. Under the circumstances, we feel the Tribe's case against the State should be separately remanded, and an opportunity given to sever the claim against the State and point out specific evidence relied upon to show avulsion on the particular land claimed by the State.[10] The district court shall review this evidence and make separate findings in regard to it.

The judgment of the district court is ordered vacated; the cause is remanded with directions to enter judgment quieting title to the trust lands involved in this action, except those claimed by the State of Iowa, in the United States as trustee and the Omaha Indian Tribe; the prior orders relating to escrow funds and accounting procedures, with the exception of those funds relating to the land now claimed by the State of Iowa, governing the 2,900 acres within the original boundary of the Barrett Survey as originally ceded to the Tribe in

the Treaty of 1854, are ordered dissolved. The judgment of the district court is vacated as to the State of Iowa, and the cause remanded with directions that the Tribe's case against the State be severed and the Tribe given an opportunity to clarify its allegations against the State and the evidence it relies upon, so that the district court may separately review whether the Tribe has sustained its burden of proof against the State.

---

10. We fail to understand the Tribe's argument that the State's case is defective because its title is based upon quitclaim deeds, but will allow the Tribe to restate the argument in district court.